Michael P. Laffey
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332-9300
mlaffey@messinalawfirm.com

Michael R. Ross*
Tyson C. Langhofer*
ALLIANCE DEFENDING FREEDOM
CENTER FOR ACADEMIC FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(480) 444-0020
mross@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Plaintiffs*

**Pro hac vice applications forthcoming.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| YOUNG AMERICANS FOR LIBERTY AT MONTCLAIR STATE UNIVERSITY, and MENA BOTROS;<br><br>       Plaintiffs,<br><br>v.<br><br>The Trustees of Montclair State University—ROSE L. CALI, MARY A. COMITO, VICE-CHAIR DR. FRANCIS M. C. CUSS, CHAIR GEORGE J. HILTZIK, LAWRENCE R. INSERRA, JR., DOUGLAS L. KENNEDY, RALPH A. LAROSSA, JEAN MARC DE GRANDPRE, JOHN L. MCGOLDRICK, WILLIAM T. MULLEN, PRESTON D. PINKETT III, SECRETARY KENT SLUYTER, and STUDENT NIKITA WILLIAMS—all individually and all in their official capacities as members of the Montclair State University Board of Trustees; SUSAN A. COLE, President of Montclair State University, in her official and individual capacities; KAREN PENNINGTON, Vice President of Student Development & Campus Life of Montclair State University, in her official and individual capacities; MARGAREE COLEMAN-CARTER, Dean of Students of Montclair State University, in her | Civil Case No.:<br><br><br>**VERIFIED COMPLAINT**<br><br><br>**Jury Trial Demanded** |

1

official and individual capacities; **PAUL M. CELL**, Chief of Police of Montclair State University, in his official and individual capacities; **KALUBA CHIPEPO**, Sergeant of Campus Police for Montclair State University, in his official and individual capacities; **YOLANDA ALVAREZ**, Chair of Bias Education Response Taskforce of Montclair State University, in her official and individual capacities; **HAMAL STRAYHORN**, Co-Chair of Bias Education Response Taskforce of Montclair State University, in her official and individual capacities; **THE STUDENT GOVERNMENT ASSOCIATION OF MONTCLAIR STATE UNIVERSITY INC.**,

Defendants.

## Verified Complaint

Plaintiffs Young Americans for Liberty at Montclair State University and Mena Botros, by and through counsel, and for their Complaint against Defendants, state as follows:

1.   Pursuant to Local Rule 10.1, the mailing addresses of the parties are:

Young Americans for Liberty at Montclair State University
16 Suburbia Drive
Jersey City, NJ 07305

Mena Botros
16 Suburbia Drive
Jersey City, NJ 07305

Trustees of Montclair State University
Office of the President
1 Normal Avenue
Montclair, NJ 07043

Susan A. Cole
President, Montclair State University
Office of the President
1 Normal Avenue
Montclair, NJ 07043

Karen Pennington
Vice President, Student Development & Campus Life of Montclair State
University
1 Normal Avenue
Montclair, NJ 07043

Margaree Coleman-Carter
Dean of Students, Montclair State University
1 Normal Avenue
Montclair, NJ 07043

Paul M. Cell
Chief of University Police, Montclair State University Police
1 Normal Avenue
Montclair, NJ 07043

Kaluba Chipepo
Sergeant of Campus Police, Montclair State University
1 Normal Avenue
Montclair, NJ 07043

Yolanda Alvarez
Chair of Bias Education Response Taskforce
1 Normal Avenue
Montclair, NJ 07043

Hamal Strayhorn
Co-Chair of Bias Education Response Taskforce
1 Normal Avenue
Montclair, NJ 07043

The Student Government Association of Montclair State University Inc.
1 Normal Avenue
Montclair, NJ 07043

## Introduction

2.    The campus of a public university is a supposed to be a "marketplace of
ideas." But on September 10, 2019, Montclair State University ("MSU" or the
"University") shut down three students who were peacefully expressing their ideas
in a generally accessible, common outdoor area of campus. The students dressed in
orange jumpsuits and held up signs voicing their support—as pretend criminals—

3

for gun-free zones. The students were expressing their views that laws creating gun-free zones benefit only criminals and endanger law-abiding citizens. A campus police officer forced them to stop their expressive activity because they had not obtained prior permission from the University to speak on campus.

3.    The University maintains that Plaintiffs must obtain permission to speak at least two weeks in advance under the University's Demonstrations & Assemblies Policy. Moreover, the University can deny a student's request for permission or indefinitely withhold it for any reason. This two-week requirement imposes an unconstitutional prior restraint on all students throughout the entire campus.

4.    The University and the Student Government Association (the "SGA") also maintain an unconstitutional set of student organization regulations which delegates to the SGA unbridled discretion to grant privileges and financial benefits from mandatory student fees based on an organization's "Class." This Class determination explicitly requires the SGA to scrutinize a student organization's viewpoint and the content of its speech, and it places virtually no limits on the SGA's ability to favor and disfavor certain viewpoints.

5.    The SGA has utilized this unbridled discretion to relegate Plaintiff YAL to the lowest possible classification which substantially limits Plaintiff's ability to obtain funding even though all of Plaintiff's members are required to pay mandatory student fees.

6.    The University also maintains a Bias Education Response Taskforce to punish so-called "bias incidents" (i.e., "conduct, speech or expression that is motivated by bias or prejudice"), a term which is defined so broadly that it encompasses protected speech on important social and political discussions in which Plaintiffs regularly engage.

7.   The First and Fourteenth Amendments require this Court to strike down these unconstitutional restrictions on speech and to enjoin the University from enforcing these restrictions against Plaintiffs.

## Jurisdiction and Venue

8.   This is a civil rights action that raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

9.   This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

10.  This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

11.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and because all of the acts described in this Complaint occurred in this district.

## Plaintiffs

12.  Plaintiff Young Americans for Liberty at Montclair State University ("YAL") is an unincorporated expressive association made up of Montclair State University students.

13.  YAL is a non-partisan, student-led organization, and part of its mission is to be an expressive association at MSU.

14.  YAL has been a recognized student organization since 2018 and it is currently classified as a Class IV student organization by the SGA.

15.  YAL is affiliated with Young Americans for Liberty, a non-partisan organization with over 500 chapters at public and private universities throughout the country.

16.   YAL's mission is to identify, educate, train, and mobilize students to promote the principles of the natural rights of life, liberty, and property.

17.   Plaintiff Mena Botros is a sophomore at MSU and the President of YAL.

18.   Plaintiffs desire to express their message on MSU's campus through a variety of means, including flyers, signs, peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students about the natural rights of life, liberty, and property, among other things.

19.   When engaging in these expressive activities, Plaintiffs will discuss political, religious, social, cultural, and moral issues and ideas.

**Defendants**

20.   Defendants Rose L. Cali, Mary A. Comito, Dr. Francis M. C. Cuss, George J. Hiltzik, Lawrence R. Inserra, Jr., Douglas L. Kennedy, Ralph A. LaRossa, Jean Marc de Grandpre, John L. McGoldrick, William T. Mullen, Preston D. Pinkett III, Kent Sluyter, and Nikita Williams, are, and were at all times relevant to this Complaint, members of the Board of Trustees of the Montclair State University (collectively, "Trustee Defendants"), a public university organized and existing under the laws of New Jersey.

21.   Among other duties, Trustee Defendants adopt and authorize policies that govern students at MSU, including the policies challenged herein. (Ex. 1 at 1, 5–6, Art. I, Title IV.)

22.   Each Trustee Defendant is responsible for enacting, amending, and repealing the Board of Trustees' policies. (Ex. 1 at 1, 5–6, Art. I, Title IV.)

23.   Trustee Defendants are each sued in their individual and official capacities.

24.   Defendant Susan A. Cole is, and was at all times relevant to this Complaint, the President of MSU. The Board of Trustees has delegated to Defendant Cole the power to exercise discretionary authority and perform duties

6

vested in the Board of Trustees related to the operation, control, and management of the University. (Ex. 1 at 1, Art. II.)

25.   Cole is responsible for the administration and enforcement of policies and regulations relating to the operation of the University. Cole has the authority to delegate this authority among subordinates.

26.   Thus, Cole is responsible for promulgating, implementing, and enforcing the University policies, procedures, and practices that are depriving Plaintiffs and other students of their constitutional rights and are challenged in this suit.

27.   Cole also has the authority to review, approve, or reject the decisions of other University officials and the other non-Trustee Defendants regarding the policies, procedures, and practices challenged in this suit.

28.   Cole authorized, approved, or implemented the policies, procedures, and practices challenged herein. She has also failed to stop any MSU officials from applying these policies, procedures, and practices against the Plaintiffs.

29.   Defendant Cole is sued in her individual and official capacities.

30.   Defendant Karen Pennington is, and was at all times relevant to this Complaint, the Vice President of Student Development & Campus Life at MSU. Pennington oversees all of Student Development & Campus Life, which includes the Office of the Dean of Students and the Bias Education Response Taskforce.

31.   Pennington authorized, approved, or implemented the policies, procedures, and practices relating to the Speech Permit Policy and the Bias Education Response Taskforce policies, procedures, and practices. She has also failed to stop any MSU officials from applying these policies, procedures, and practices against the Plaintiffs. Pennington is sued in her individual and official capacities.

32.   Defendant Margaree Coleman-Carter is the Dean of Students at MSU. She is in charge of the Office of the Dean of Students, which is responsible for

approving, modifying, or denying requests for students to speak on campus under the Speech Permit Policy.

33.   Coleman-Carter also reviews bias incident reports and has the power to discipline students for violating University Policies.

34.   Coleman-Carter and her subordinates in the Office of the Dean of Students enforced the Speech Permit Policy against Plaintiffs.

35.   Coleman-Carter is sued in her individual and official capacities.

36.   Defendant Paul M. Cell is the Chief of Police for Montclair State University. Defendant Cell oversees and manages the University Police of MSU.

37.   Defendant Cell is responsible for enforcing MSU's policies, including the Speech Permit Policy.

38.   Defendant Cell and his subordinates in the University Police enforced the Speech Permit Policy against Plaintiffs.

39.   Defendant Cell is also responsible for the University Police's involvement in responding to, investigating, and enforcing regulations against "bias incidents."

40.   Defendant Cell is sued in his individual and official capacities.

41.   Defendant Kaluba Chipepo is the Sergeant of Campus Police for Montclair State University Police.

42.   Defendant Chipepo enforced the Speech Permit Policy against Plaintiffs on September 10, 2019 when he ordered them to stop engaging in their expressive activity.

43.   Defendant Chipepo is sued in his individual and official capacities.

44.   Defendant Yolanda Alvarez is the Chair of MSU's Bias Education Response Taskforce. Alvarez is also the Associate Dean of Students. As the Taskforce Chair, Alvarez has the power to promulgate, implement, and enforce policies, procedures, and practices for the Bias Education Response Taskforce,

including the ones that are depriving Plaintiffs and other students of their constitutional rights and are challenged in this suit.

45.  Defendant Alvarez is sued in her individual and official capacities.

46.  Defendant Hamal Strayhorn is the Co-Chair of MSU's Bias Education Response Taskforce. Strayhorn is also the Director of the Office for Social Justice and Diversity. As the Taskforce Co-Chair, Strayhorn has the same authorities and powers as Ms. Alvarez, described above.

47.  Defendant Strayhorn is sued in his individual and official capacities.

48.  Defendant Student Government Association of Montclair State University Inc. ("SGA"), a non-profit corporation incorporated and operating in New Jersey, is the official student government association for MSU.

49.  SGA is responsible for administering and overseeing the use and disbursement of mandatory Student Government Association Fees collected from each undergraduate student. (Ex. 2 at 2.)

50.  SGA also sets policies and procedures governing student organizations on campus. In particular, SGA establishes requirements for a student organization to be officially recognized at MSU and sets and enforces the benefits, monetary and otherwise, to which student organizations are entitled. (Ex. 2 at 2.)

## Facts

I. **The University's unconstitutional policies restrict and suppress student speech.**

51.  The University maintains three unconstitutional sets of policies: (1) the Demonstrations and Assemblies Policy, (2) the student organization registration and funding regulations, and (3) the "bias incident" regulations and Bias Education Response Taskforce.

A.  **The Speech Permit Policy requires all students to obtain permission two weeks in advance before speaking on campus and does not provide any objective guidelines to restrain administrative discretion.**

52.  The Demonstrations and Assemblies Policy (the "Speech Permit Policy" or "Policy") regulates all expressive activity on campus, including (i) demonstrating and assembling to provide information, express views, or protest, (ii) displaying posters and distributing literature, (iii) organizing activities that present differing viewpoints, and (iv) expressing views at all organized events and activities where the opportunity for such expression is offered by the organizers. (Ex. 3 at 1.)

53.  As detailed below, the Speech Permit Policy, facially and as applied, is an unconstitutional prior restraint on speech because it (i) contains no objective guidelines to restrict the University's discretion, (ii) fails to ensure timely decision making on a student's request to speak, (iii) unconstitutionally discriminates against the content or viewpoint of a student's speech, (iv) and because two weeks is an unconstitutional and unreasonable amount of time to require advance permission.

54.  Students may not "demonstrate or assemble" without obtaining written permission from the Office of the Dean of Students at least two weeks in advance. (Ex. 3 at 2.)

55.  But the Speech Permit Policy does not define two key terms: "demonstration" or "assembly."

56.  The only exception from this two-week requirement is where a student's expression qualifies as "spontaneous" and is made "in response to emergent situations where advance planning is not possible." (Ex. 3 at 3.)

57.  The Policy restricts spontaneous expression to two small outdoor locations: a) the Plaza in front of the Student Center, and b) the Amphitheater. (Ex. 3 at 3.) Any students engaging in spontaneous expression also "must report that information immediately to the Office of the Dean of Students." (Ex. 3 at 3.)

10

58.   To request permission to speak—regardless of how small an event is—a student must fill out a "Request for Demonstration, Assembly, Presentation or Forum" form, which requires the following information:

a) the identity of the University employee, student, group or organization making the request;

b) the date(s) and time(s) of the event;

c) the desired location for the event;

d) the planned objective of the event;

e) the materials that will be used to conduct the event, including information concerning any music or sound amplification;

f) for University groups or organizations or University sponsored groups or organizations, the number of people expected to participate in the event; and

g) the estimated number of people the event organizers expect to attract to the event.

(Ex. 3 at 2.)

59.   After receiving this Request Form, the Office of the Dean of Students may approve, modify, or deny a request to demonstrate or assemble for any reason. The Speech Permit Policy does not require the Office of the Dean of Students to approve, modify, or deny such a request within any set timeframe.

60.   The Speech Permit Policy authorizes University officials to grant exceptions based upon "special circumstances" but fails to define "special circumstances." (Ex. 3 at 3.) Accordingly, the Office of the Dean of Students has the power to selectively enforce the Speech Permit Policy based upon the content and viewpoint of students' speech.

61.   The Speech Permit Policy thus grants Defendant Coleman-Carter and the Office of the Dean of Students unbridled discretion to grant or deny students permission to speak on campus.

62.   The Speech Permit Policy also limits demonstrations and assemblies to times between 8:00 a.m. and 10:00 p.m. (Ex. 3 at 2.)

11

63.   The Speech Permit Policy also prohibits "[s]igns affixed to poles or sticks." (Ex. 3 at 2.)

64.   If a student violates the Speech Permit Policy, he or she "will be subject to disciplinary action under applicable University policies, … and the Student Code of Conduct." (Ex. 3 at 3.)

65.   The University police are authorized to enforce the Speech Permit Policy and take appropriate action to curb any violations. (Ex. 3 at 3.)

**B.   The University authorizes the SGA to punish recognized student organizations who express disfavored viewpoints.**

66.   The University's student organization regulations (the "Class System") authorize the SGA to reward favored groups with a high "Class" status, while disfavoring groups like YAL with a low status which excludes them from many of the benefits enjoyed by other student organizations.

67.   The Trustee Defendants possess the authority to delegate authority to "carry[] out the purpose of the college" and, accordingly, to set the amount of and disburse tuition fees, including student activity fees. N.J. Stat. § 18A:64-13, § 18A:64-6(e), (f), (k), (o).

68.   The University charges each undergraduate student a mandatory student fee as part of tuition. This includes a portion titled "Student Government Association Fee" (the "SGA Fee"). (Ex. 4 at 1–2.)

69.   For the 2019–2020 academic year, the SGA Fee is $48.90 per student, per semester for full-time students, and $3.26 per credit hour, per semester for part-time, undergraduate students. (Ex. 4 at 1.)

70.   With approximately 17,000 undergraduate students, this amounts to approximately $1,500,000 collected through the SGA Fee and allocated to the SGA annually.

71.   Plaintiff Mena Botros is currently a sophomore by credit and has paid $280.36 in student fees since he started attending MSU. This total includes $48.90 for Fall 2017, $48.90 for Spring 2018, $35.86 for Fall 2018, $48.90 for Spring 2019, $48.90 for Fall 2019, and $48.90 for Spring 2020.

72.   The SGA works with the University Finance and Treasury Department to set an annual budget. (Ex. 5 at 1.)

73.   The University has granted the SGA discretion to utilize the SGA fees in the manner determined by the SGA. (Ex. 2 at 2, Art. II, § 4.C–D.)

74.   The University has granted the SGA plenary authority "to regulate the activities of student organizations," including the ability to "charter, rescind charters, and provide for the regulation of the Student organizations" at MSU, and to "withhold approval of student activities and functions." (Ex. 2 at 1–2.)

75.   Pursuant to this authority, the SGA has set up a literal "Class" system that grants certain student organizations special benefits, including substantial financial advantages, based on the organization's seniority and viewpoint expressed by the organization.

76.   The SGA categorizes organizations as one of four Classes. Class I organizations receive the most benefits, while Class IV organizations receive the fewest. (Ex. 6 at 46–48; Ex. 7 at 2, 8, 14, 20.) The SGA has the authority to set the amount and type of benefits at its discretion each year and to distribute those benefits to organizations as it sees fit.

77.   For example, Class I organizations currently receive (i) a yearly budget set by the SGA, (ii) the ability to ask for cash advances, (iii) up to $5,000 in emergency appropriations and $5,000 in supplemental appropriations, (iv) the ability to buy equipment, (v) the ability to have a flexible budget, (vi) the ability to keep a portion of what they fundraise through advertising, and (vii) the ability to attend conferences and conventions using SGA funds. (Ex. 6 at 47, 53, 55, 56, 59; Ex. 8 at

7–8; Ex. 7 at 2.) They also receive a number of non-monetary benefits, such as an SGA legislative representative and priority for student office space. (Ex. 6 at 47; Ex. 7 at 2.)

78.   For the 2019–2020 academic year, Class II organizations (i) must ask the legislature for money, (ii) are limited to $6,000 in appropriations per year, (iii) are limited to $3,000 in emergency and supplemental appropriations, and (iv) must share $40,000 between all Class II organizations each year. (Ex. 6 at 59–60, 62; Ex. 8 at 8.) Subject to the discretion of the SGA, Class II organizations may also request any unappropriated surplus funds if the $40,000 is depleted. (Ex. 6 at 59–60.) Class II organizations can also request student office space. (Ex. 6 at 47; Ex. 7 at 8.)

79.   Class III organizations are similarly limited, but are restricted to $3,000 in appropriations per year, $2,000 in emergency and supplemental appropriations, and must share $20,000 between all Class III organizations. (Ex. 6 at 59–60, 63; Ex. 8 at 8.) Subject to the discretion of the SGA, Class III organizations may also request unappropriated surplus funds. (Ex. 6 at 60.) Class III organizations may not request office space. (Ex. 6 at 47–48.)

80.   Class IV organizations are even more restricted. They cannot request funding from the SGA Legislature like other organizations and instead must fundraise to get money. (Ex. 6 at 48; Ex. 7 at 20.) They have no ability to request emergency and supplemental appropriations. (Ex. 8 at 8; Ex. 6 at 59.)

81.   The SGA can nevertheless grant Class IV organizations some funding by matching "dollar for dollar total cash contributions" from the organization's members or from an organization's fundraising, but only up to $500 each year, and only up to $5,000 for all Class IV organizations collectively. (Ex. 6 at 60, 63; Ex. 8 at 5.) Even then, the SGA has complete discretion in determining whether to approve the request to match funds.

82.   Unlike Classes I–III, Class IV organizations do not "have the privilege of appropriating money from Unappropriated surplus" student funds. (Ex. 6 at 50.) That is, Class IV organizations cannot receive more than the small amount of money set aside for them ($5,000 collectively for 2019–2020) for an academic year. Again, the only way the Class System allows those funds to go to Class IV organizations is by matching outside donations dollar for dollar.

83.   For all Classes I–IV, there are no objective criteria preventing the SGA from limiting or denying requests for appropriations, office space, or any other benefit based on an organization's views or its content. (*E.g.*, Ex. 8 at 8.) This includes emergency and supplemental appropriations, as well as requests for unappropriated surplus funds.

84.   The SGA assigns an organization to a Class based on the organization's viewpoint, as well as a number of other subjective and discretionary considerations. For example, the SGA will classify an organization as Class I only if the SGA believes that organization has "an appeal that reaches the general interest of the entire campus community or … that fosters pride and mobilizes awareness of the interests of a large, distinct, and prolific subculture of the campus community, as deemed by the discretion of the chartering process." (Ex. 6 at 46; Ex. 7 at 2.)

85.   On the other hand, the SGA classifies an organization as Class III or Class IV if it "meets the needs of a very specific and unique interest of the campus community" and attracts students who "are yet to be specifically represented by a chartered organization" (Ex. 6 at 47–48; Ex. 7 at 14, 20.)

86.   An organization is considered Class IV if the SGA determines that it is an "entry level organization[]," but there are no definitions or guidelines for making this determination. (Ex. 6 at 48; Ex. 7 at 20.)

87.   Class IV organizations are required to obtain approval from SGA to re-charter their organization every year. And Class I, II, and III organizations are

required to obtain approval from SGA to re-charter their organization every two years. (Ex. 7 at 2, 8, 14, 20.)

88. The SGA also heavily considers an organization's views and content when it decides whether to approve or "re-charter" student organizations.

89. To charter, the organization must, *inter alia*, submit a draft constitution, disclose the nature and purpose of the club, and appear before the SGA's Organizational Review Committee in person to describe events it intends to hold. The organization must answer questions from the SGA such as "How does the organization differ from other organizations on campus?" and "How does this organization benefit the campus community?" (Ex. 9 at 3–7, Ex. 10 at 1.)

90. Existing organizations must also fill out an accreditation report and describe events from the past year(s) when re-chartering. (Ex. 7 at 5, 8, 14, 20.)

91. All student organizations must also submit a proposed budget each year. (Ex. 8 at 17–19.) To get a budget approved, all student organizations must, *inter alia*, appear before the SGA twice, first before the SGA Appropriations Committee to answer "questions concerning the budget and recommended changes." (Ex. 8 at 19.) If the Appropriations Committee approves the budget, it will recommend a vote to the entire SGA Legislature. (Ex. 8 at 19.)

92. "At the Legislative meeting, the organization will be asked questions concerning the nature of the programming, and the related costs. **The organization must be prepared to answer questions covering all aspects of their programming and to justify all expenses.**" (Ex. 8 at 19.) The Legislature will then vote to either approve or deny the budget request. (Ex. 8 at 19.)

93. Moreover, "[f]ailure to sufficiently answer legislators' questions may result in a lower budget." (Ex. 8 at 19.)

94. The SGA also determines an organization's Class by seniority. A Class III organization must spend two years as Class III before it is eligible to advance to

Class II, and a Class II organization must similarly spend four consecutive years as Class II before it can advance to Class I. (Ex. 6 at 46–47; Ex. 7 at 2, 8.)

95.   In addition to assessing an organization's viewpoint and seniority, the SGA also determines an organization's Class by maintaining a tier system within each Class to "hold organizations accountable for their performance" and to "guide them in their endeavors as they strive to advance classification within the SGA." (Ex. 7 at 3, 9, 15, 21.)

96.   The SGA has no objective guidelines or criteria that require it to assess student organizations on viewpoint- and content-neutral terms.

97.   The SGA has no objective guidelines or criteria enabling student organizations as a matter of right to access student funds.

98.   In short, the SGA allocates student-funded money and other substantial benefits through its "Class" system by explicitly considering an organization's viewpoint, extensively assessing an organization's purpose and content during charterment and re-charterment, by implementing a seniority system, and through its discretionary and discriminatory "tier" system.

**C.   The University threatens coercive re-education, investigations, discipline, and criminal investigation for students who engage in protected speech.**

99.   The University maintains a Bias Education Response Taskforce ("BERT") made up of various university faculty and administrators, including Captain Kieran Barrett and Lieutenant Carlos Ortiz of the University Police, and is co-headed by Defendants Alvarez and Strayhorn. (Ex. 11 at 2.)

100. According to the University, BERT exists "to provide a well-coordinated and comprehensive response to incidents of intolerance and bias with respect to race, ethnicity, gender, sexual orientation, disability, religion and national origin." (Ex. 11 at 1.)

101. The University defines a "bias incident" as "conduct, speech or expression that is motivated by bias or prejudice but doesn't involve a criminal act." (Ex. 11 at 6.)

102. On its "bias incident" webpage, the University links to an article on www.tolerance.org to define a "bias incident." (Ex. 11 at 6–8.) The article has ten examples of bias incidents, which include considering whether (i) "[t]he target(s) believe the incident was motivated by bias," (ii) the "targets and perpetrators are of a different race, religion, national origin, gender or sexual orientation," and (iii) "acts are directed against members of groups whose presence in the community or school is opposed—e.g. Mexican immigrant students in a community where nativist groups are active." (Ex. 11 at 6–7.)

103. The University encourages students who believe they were subject to a "bias motivated act/incident on campus" to report it to BERT "as promptly as possible." (Ex. 11 at 2.) The University allows students to report bias incidents through a hyperlink on the BERT webpage. (Ex. 11 at 2.)

104. The bias incident report form states that "[a]ll reports will be evaluated to determine if they should be further investigated for potential violations of University policy and/or criminal law." (Ex. 11 at 1.)

105. The bias incident report form allows students to fill out basic information about the alleged "bias incident," to identify the persons involved, and encourages them to "be as specific as possible," to provide any available supporting documentation, and to identify the targeted "identities and/or communities." (Ex. 12 at 2–3.)

106. The form also allows a student to request to speak with someone from BERT about the incident. (Ex. 12 at 2.)

107. The University empowers Defendant Coleman-Carter, BERT, and University Police to manage, investigate, and punish students for bias incidents. (Ex. 11 at 1–3, 5.)

108. The Office of the Dean of Students receives bias incident reports. Upon receiving a bias incident report, the office will "immediately: Contact University Police and/or the Vice President of the SDCL (or designee), who will assume responsibility for managing the reported incident." (Ex. 11 at 2.)

109. The office of the Dean of Students also closely "collaborate[s] with University Police and the BERT Task Force to assess the situation and determine next steps." (Ex. 11 at 2–3.)

110. The University Police also use their coercive power to further BERT's reach on campus. The University Police state on their webpage that they are "an active member" of BERT's ongoing mission "to help eradicate instances of bias intimidation." (Ex. 11 at 5.)

111. In this same vein, the University has a number of statements and education initiatives that target disfavored speech and thus inform the scope of BERT and the definition of a "bias incident." (Ex. 11 at 9–11.)

112. The University has published a Human Relations Statement on Campus Climate for Civility and Human Dignity, which states that MSU must have a "special sensitivity to those most likely to be subjected to disrespect, abuse, and misunderstanding" and that MSU's goal is to restrict expression in a manner that MSU deems "appropriate in a multi-ethnic and multi-cultural society." (Ex. 13 at 1.)

113. The University has not published any other procedures or policies for handling bias response reports. Nor has the University published any publicly available data or logs of incident reports.

114. BERT also has authority to discipline students it investigates for "bias incidents" by issuing sanctions under the Student Code of Conduct, which provides

19

that "[v]iolations of the Code of Student Conduct that can be proven to have been motivated by illegal bias will result in the imposition of more severe sanctions." (Ex. 14 at 9.)

115. The Student Code of Conduct also prohibits protected speech by defining "discriminatory harassment, intimidation or bullying" to include "any gesture, written, verbal or physical act … whether it be a single incident or a series of incidents" that the "student directs at a specific group or individual." (Ex. 12 at 14–15.)

116. If the University determines that a student has violated this vague and overly broad definition of harassment, it can issue any discipline, from probation to expulsion. (Ex. 12 at 15.)

117. Defendant Coleman-Carter may also issue a "University No Contact Order" against any student that the University determines has violated this same provision. (Ex. 12 at 23.) There are no limits set on the duration of a No Contact Order.

118. Defendant Coleman-Carter may also issue any level of sanctions, from warnings to expulsions, for any student who violates any of the University's "written policies, regulations, and announcements." (Ex. 12 at 22.)

119. The Student Code of Conduct further specifies that "[s]tudent groups and organizations recognized by student government and/or their officers may be charged with and held responsible for violations of the Code of Student Conduct." (Ex. 12 at 22.) The University also threatens various "institutional sanctioning." (Ex. 12 at 22.)

## II. Defendants' enforcement and threats of enforcement have deprived Plaintiffs of their First Amendment rights.

## A. The University shut down Plaintiffs' speech.

120. On September 10, 2019, Mr. Botros and two other students stood outside on a large sidewalk near University Hall and Feliciano School of Business on MSU's campus to express their disagreement with laws banning law-abiding citizens from carrying guns for self-defense. (Ex. 15.)

121. The students wore orange jumpsuits and held up three signs, each of which said one of the following: "every civilian gun is a threat," "disarm law abiding citizens," and "criminals for gun free zones." (Ex. 15 at 1:21.)

122. The students collectively paid $50.85 to purchase orange jumpsuits to engage in this expressive activity, including $16.95 paid by Mr. Botros.

123. The students were not blocking access to buildings or pedestrian traffic. The students were speaking at normal levels and were not using amplified sound. The students were not interfering with any MSU activities or other planned events on campus.

124. While the students were engaged in these activities, Defendant Chipepo, a University Police Officer, approached Mr. Botros and the other students and informed them that they were violating the Speech Permit Policy because they had not obtained permission to speak from MSU officials.

125. Defendant Chipepo told the students that they must obtain permission and the office will want information on the group before they can continue. He also stated that the office will set "a day, a time, and a location in order for you to legally be here." (Ex. 15 at 0:33–0:49.)

126. When Mr. Botros asked what policy they were violating, Defendant Chipepo replied that "the school's policy" is that anyone who's going to "have a protest [must] go through the right channels." (Ex. 15 at 1:22–1:32.)

21

127. When Mr. Botros asked what would happen if they don't cease, Defendant Chipepo responded: "What you're doing now, will just be terminated …. protests cannot continue." (Ex. 15 at 1:53–2:08.)

128. Pursuant to Defendant Chipepo's orders, Mr. Botros and the other students stopped their expressive activity, left the area, and did not return.

129. Because of the Speech Permit Policy, Plaintiffs are not engaging in certain expressive activities to communicate their views on the MSU campus.

130. Because of the Speech Permit Policy, Plaintiffs are chilled in their ability to promote YAL at MSU and to discuss other important political, religious, and ideological views on campus.

**B.    The University's Class System unconstitutionally restricts student association and penalizes Plaintiffs for engaging in protected speech.**

131. Plaintiffs desire to operate their student organization, Young Americans for Liberty, at the University and to use student-fees for funding for many of its events.

132. As a political organization, many of YAL's events and operations are expressive or involve protected speech.

133. Since it began operating at the University in 2018, YAL has been classified by the SGA as a Class IV organization. Because the SGA has determined that YAL is still "entry level" for the 2019–2020 school year, YAL is not eligible to request funding, to receive more than $500 in matching contributions, or to receive any supplemental or emergency funds for its events and operations.

134. The SGA's classification of YAL as a Class IV organization is a viewpoint- and content-based violation of YAL's speech.

135. The SGA has no objective guidelines or regulations that restrain its ability to make such determinations based on YAL's viewpoint and the content of YAL's speech.

22

136. Because the SGA has imposed a seniority system, YAL is not eligible for a budget or for its fair share of funding from the mandatory student activity fees.

137. Meanwhile, the University's website lists 13 Class I organizations, 13 Class II organizations, 35 Class III organizations, and 11 Class IV organizations, including YAL. (Ex. 16 at 1–3.)

138. There are no political organizations other than YAL in Class IV. There are several political organizations in Class III organizations, including the YesSheCanCampaign, Environmental Club, and Animal Activists. Political Class II organizations include the openly left organizations Justice for Education and Femvolution. (Ex. 16 at 2–3.)

139. YAL has been and will continue to be denied funding for its events because the student organization regulations grant the SGA unbridled discretion to allocate mandatory student fees based upon viewpoints favored by the SGA. The SGA has utilized this discretion to favor the speech of certain student organizations and to disfavor all other student speech, including Plaintiffs'.

## C. The Speech Permit Policy and BERT are preventing Plaintiffs from engaging in other core political speech.

140. Plaintiffs desire to speak on campus on a number of topics which some members of campus may oppose or consider controversial.

141. For example, Plaintiffs desire to speak out against gun control laws and criticize the deleterious impact that gun laws have on racial minorities. Specifically, Plaintiffs desire to stand on sidewalks on the University's campus, hold up signs saying that gun laws are racist, and distribute literature showing the adverse impact that gun laws have on racial minorities.

142. Plaintiffs also desire to speak against minimum wage laws by setting up a "unionized hot dog stand" and comparing its prices to a normal hot dog stand.

143. Plaintiffs also desire to host anti-war events showing the number of soldiers who have died overseas since 2017.

144. Plaintiffs also desire to promote free speech as a fundamental constitutional right by handing out pamphlets and holding up signs, even though some increasingly criticize free speech as "dangerous" and biased against certain groups.

145. Plaintiffs desire to engage in these expressive activities, as well as many others, throughout various open, generally accessible outdoor areas of campus without having to obtain permission multiple weeks in advance and without being confined to the time and location assigned to them by the Office of the Dean of Students.

146. The University's prior permission requirement and the administrative restrictions on spontaneous speech in the Speech Permit Policy prevent Plaintiffs from engaging in expressive activities in the manner of their choosing even on property that is held open to the students as a public forum.

147. Since the University enforced the Speech Permit Policy against Plaintiffs, Plaintiffs have greatly curtailed, restricted, and limited any efforts to express their political views, engage in civil discourse, or to share political literature with students and other University persons in any open, outdoor, generally accessible areas of campus.

148. Plaintiffs are also aware of the University's Bias Education Response Taskforce and its overly broad and vague definition of a "bias incident." Plaintiffs credibly fear that expressing their views on their preferred topics could result in being reported, investigated, and punished by the BERT, the Office of the Dean of Students, or other officials from Student Development and Campus Life.

149. Plaintiffs credibly fear that University Police will investigate them for criminal charges pursuant to a "bias incident" investigation. Plaintiffs also fear that

24

the University may seek to recommend Plaintiffs for "reeducation" through counselling or by mandating that they attend some of its "educational" social justice programs. Plaintiffs also credibly fear that the University will punish them and impose sanctions according to the Student Code of Conduct for violating University policies, including the unconstitutional discriminatory harassment policy and Speech Permit Policy.

150. Thus, the University's ban on "bias incidents" and associated practices chill Plaintiffs' speech. They have deterred and continue to deter Plaintiffs from speaking openly about issues of public concern. The only way for Plaintiffs to be sure that they will not be investigated or punished is to engage in self-censorship.

## Allegations of Law

151. At all times relevant to this Complaint, each and all of the acts alleged herein were attributed to the Defendants, who acted under color of a statute, regulation, custom, or usage of the State of New Jersey.

152. By forcing Mr. Botros to stop engaging in peaceful expressive activities in an outdoor, generally accessible area of campus and requiring him to obtain permission prior to engaging in speech with others on campus, the Defendants enforced an unconstitutional prior restraint on speech and therefore violated the Plaintiffs' First Amendment free speech rights.

153. By failing to adequately define key terms of the Speech Permit Policy such as "demonstration," "assembly," "emergent situations," and "special circumstances," the Defendants have maintained and enforced a set of policies and practices that are unconstitutionally overbroad and vague and therefore violated Plaintiffs' First Amendment free speech and Due Process rights when they enforced the Speech Permit Policy against Plaintiffs.

154. By imposing a Class System with onerous registration requirements upon student organizations that are funded largely by mandatory student fees, and by

25

failing to restrain the discretion of the SGA in administering this Class System, Defendants are violating Plaintiffs' First Amendment free speech rights.

155. By explicitly considering a student organization's viewpoint, the content of its speech, its size, and its popularity when deciding whether to re-charter that organization and what Class status it should have, Defendants are unconstitutionally discriminating against YAL based on its viewpoint and the content of its speech.

156. By requiring Plaintiffs to pay a mandatory student activity fee that is used to fund student organization speech on campus in a manner that is not viewpoint neutral, Defendants are unconstitutionally compelling Plaintiffs' speech.

157. By failing to properly define key terms in the Class System, such as "entry level," "specific and unique interest," "large and significant interest of the campus community," "general interest," "large, distinct, and prolific subculture," Defendants maintain and enforce a set of policies and practices that are unconstitutionally overbroad and vague and therefore violate Plaintiffs' First Amendment free speech and Due Process rights.

158. By maintaining a Bias Education Response Taskforce and its associated practices, Defendants maintain a set of policies and practices that unconstitutionally discriminate against students based on the viewpoint and content of a student's speech and therefore violate Plaintiffs' First Amendment free speech rights.

159. By failing to properly define a "bias incident" and associated operational terms, such as "bias" or "prejudice," Defendants maintain a set of policies and practices that are unconstitutionally overbroad and vague and therefore violate Plaintiffs' First Amendment and Due Process rights.

160. Each of the Plaintiffs are suffering harm from Defendants' Speech Permit Policy, Class System, Bias Incident regulations, and associated practices.

26

161. Plaintiffs have no adequate or speedy remedy at law to redress the deprivation of their constitutional rights. And unless this Court enjoins Defendants' policies and conduct, each of the Plaintiffs will continue to suffer irreparable injury.

**Count I: The Speech Permit Policy violates Plaintiffs' right to free speech.**

162. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

163. By enforcing the two-week permission requirement in the Speech Permit Policy against Plaintiffs on September 10, 2019, Defendants improperly denied Plaintiffs their First Amendment right to engage in free speech.

164. Defendants' Speech Permit Policy and Defendants' practice of forbidding students and student organizations from engaging in speech activities without express written consent at least two weeks in advance is an unconstitutional prior restraint, facially and as applied, in violation of the First Amendment.

165. Openly accessible common outdoor areas of campus at MSU are traditional or designated public forums for MSU students to engage in free speech and expression.

166. Accordingly, the First Amendment prohibits MSU from engaging in content or viewpoint discrimination against students who express themselves in these accessible common outdoor areas of campus. This includes providing adequate safeguards that prevent an MSU official from improperly excluding or restricting a student's speech based on the content of the message or the student's viewpoint.

167. The Speech Permit Policy is an unconstitutional prior restraint for multiple reasons. The Speech Permit Policy requires two weeks prior permission before engaging in expressive activities anywhere on campus.

168. The Speech Permit Policy does not provide any objective criteria or guidelines for Defendants to use when deciding whether to approve or reject a student's request to speak.

27

169. The Speech Permit Policy fails to ensure prompt decision-making because it contains no timeframe in which MSU administrators must rule on a student's request for permission to speak.

170. The Speech Permit Policy requires Defendants to examine the content and viewpoint of students' speech in deciding whether to approve, modify, or reject a students' request to speak. It thus allows administrators to expressly discriminate based on the viewpoint of the speaker or the content of the speech.

171. Defendants' Speech Permit Policy and associated practices are not the least restrictive means of serving the University's stated interests in allowing the University to carry on its normal business and academic activities. Nor do they serve a compelling state interest.

172. Defendants' Speech Permit Policy also fails to satisfy intermediate scrutiny because it is not narrowly tailored to serve a significant governmental interest and because it does not leave open ample alternative avenues of communication.

173. The Speech Permit Policy is also unconstitutionally overbroad, both facially and as-applied, because it restricts a substantial amount of constitutionally protected speech under key operative terms such as "demonstration," "assembly," "emergent situations," and "special circumstances."

174. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Speech Permit Policy, violated Plaintiffs' freedom of speech, facially and as-applied, and an injunction against Defendants' Speech Permit Policy and associated practices and actions. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

28

**Count II: The University's Class System violates Plaintiffs' free speech rights.**

175. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

176. The First Amendment's Freedom of Speech Clause prohibits the government from compelling citizens to express or support a message not of their own choosing.

177. The First Amendment's Free Speech Clause also prohibits public universities from collecting a mandatory student fee that is used to fund student organization speech if the student fees are not allocated in a viewpoint-neutral manner.

178. When a public university collects mandatory student fees and allows registered student organizations to apply for funds from those student fees, or when it otherwise makes those funds available to student groups, it creates a public forum for student speech and expression.

179. Similarly, when a public university allows student organizations to form and register around shared beliefs and interests, and when it allows those same organizations nonmonetary benefits such as representation in the student government or the ability to advertise, meet, and host events on campus, it creates a public forum for student speech and expression.

180. Accordingly, a public university may not allow viewpoint or content-based discrimination when it determines whether to officially recognize a student organization, when it allocates student organization funds through mandatory student fees, or when it allocates nonmonetary benefits to student organizations.

181. Montclair State University has created a public forum for student speech through its student organization Class System. Pursuant to the University's Class System for student organizations, Defendants engaged in content and viewpoint-based discrimination by favoring the expressive activities of dozens of other student

29

organizations that receive Class I, II, or III status and receive substantial monetary and nonmonetary benefits which Class IV organizations, including Plaintiffs' YAL chapter, do not receive.

182. The University's Class System runs afoul of Plaintiffs' clearly established First Amendment rights in a number of ways.

183. Defendants' Class System requires or allows officials to evaluate the content and viewpoint of a student organization's expression when deciding whether to recognize the organization and when deciding a student organization's Class— and therefore what access to mandatory student fees and what nonmonetary benefits it receives.

184. Defendants engaged in viewpoint and content discrimination when they classified YAL as a Class IV organization, thereby denying it certain nonmonetary benefits and the ability to request almost any portion of the mandatory student fees.

185.  Defendants' Class System grants MSU officials, including SGA officials, unbridled discretion when officially recognizing or classifying a student organization.

186. The Class System does not provide any objective criteria or guidelines for Defendants to use when deciding whether to approve or reject a student organization's request for recognition or for funding.

187. These grants of unbridled discretion to MSU officials violate the First Amendment because they create a system in which student organizations are reviewed without any objective or neutral standards, thus giving student organizations no way to prove that a classification decision was based on unconstitutional considerations.

188. Because Defendants have failed to establish neutral, objective, and comprehensive standards governing the criteria above, SGA officials are allowed to

engage in content and viewpoint discrimination when classifying student organizations and determining the level of access to campus resources and student fee funding they will receive.

189. Defendants exercised that unbridled discretion when they classified Plaintiffs' YAL chapter as a Class IV organization.

190. Defendants' Class System denies student fee funds and nonmonetary benefits to certain student organizations and grants other student organizations less access to that funding based on a series of viewpoint and content-based considerations, including the size, popularity, and interest in the organization.

191. Defendants' Class System requires MSU officials to determine an organization's "Class" by using factors that are either explicitly viewpoint-based or that are effectively viewpoint-based because they grant those officials unbridled discretion.

192. Defendants engaged in viewpoint discrimination when they classified Plaintiffs' YAL chapter as a Class IV organization, thus shutting it out from almost all of the student activity fees.

193. Through the Class System, Defendants also compel Mr. Botros to pay a mandatory student activity fee that is used to fund student organization speech on campus in a manner that is not viewpoint neutral.

194. Specifically, Defendants' Class System requires Plaintiffs to fund and support speech and viewpoints with which they disagree and which they find offensive and objectionable.

195. Defendants' Class System does not satisfy strict scrutiny because it supports no compelling government interest and because it is not narrowly tailored toward any such concerns.

31

196. Key terms in the University's Class System are also unconstitutionally overbroad, both facially and as-applied, because they restrict a significant amount of constitutionally protected speech.

197. Defendants' hierarchical ranking based on an organization's viewpoint reaches a substantial amount of protected speech.

198. By determining Class hierarchy based upon vague, undefined terms such as "entry level," "specific and unique interest," "large and significant interest of the campus community," "general interest," "large, distinct, and prolific subculture," Defendants are maintaining a set of policies and practices that are unconstitutionally overbroad, facially and as-applied, and therefore violate each of the Plaintiffs' First Amendment free speech rights.

199. Defendants' Class System thus violates Plaintiffs' right to free speech under the First Amendment.

200. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Class System, violated Plaintiffs' First Amendment right to freedom of speech facially and as-applied, and an injunction against Defendants' Class System and associated practices and actions. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**Count III: The Bias Incident Regulations violate Plaintiffs' free speech rights.**

201. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

202. Public universities cannot discriminate against students based on their viewpoint or the content of their speech.

32

203. The University's Bias Education Response Taskforce expressly targets speech based on the speaker's viewpoint and the content of the speaker's speech.

204. The University's definition of a "bias incident" encompasses speech that is fully protected under the First Amendment.

205. The University's policies authorize Defendants to investigate, threaten to punish, and punish students who perpetrate a "bias incident."

206. Plaintiffs fear that if they express views that some members of campus may consider offensive, they will be investigated and punished for engaging in such protected speech or, pursuant to a bias investigation, that they will be subject to criminal charges from the University Police, a University No Contact Order from Defendant Coleman-Carter, or disciplinary sanctions for discriminatory harassment or for violating other University policies.

207. Plaintiffs also fear that they will be subject to coercive "reeducation" through counselling or by mandating that they attend some of its "educational" social justice programs.

208. Plaintiffs' fears are credible and reasonable and based on past enforcement, the University's policies, statements, and the very existence and express purpose of BERT.

209. The University therefore threatens to discriminate against Plaintiffs solely because of their viewpoint and the content of their speech by employing the "bias incident" regulations and BERT against Plaintiffs.

210. Defendants' content- and viewpoint-based restrictions on "bias incidents" violate Plaintiffs' free speech rights because the restrictions do not serve a compelling state interest, nor are the University's restrictions the least restrictive means of serving any such interest.

211. The University's definition of a "bias incident" is also unconstitutionally overbroad. Plaintiffs seek to engage in protected expression in the open, outdoor

areas of campus, but MSU considers core political speech to fall within the definition of "bias incident."

212. Plaintiffs therefore reasonably fear that Defendants will punish core political speech by classifying it as a "bias incident."

213. Because of this reasonable fear, Plaintiffs have refrained from engaging in speech on campus on certain topics and have thus had their protected speech chilled by the University's definition of "bias incident."

214. Defendants' policies thus encompass, and actually target, a substantial amount of protected speech and therefore are unconstitutionally overbroad. Defendants' Bias Incident Regulations thus violate Plaintiffs' right to free speech under the First Amendment.

215. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Bias Incident Regulations, have violated and continue to violate Plaintiffs' First Amendment right to free speech, and an injunction against Defendants' Bias Incident Regulations and associated practices and actions facially and as-applied. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

### Count IV: The Speech Permit Policy violates Plaintiffs' Due Process rights because it is unconstitutionally vague.

216. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

217. Plaintiffs seek to engage in protected expression in the open, outdoor areas of campus, but the Policy does not make clear what types of speech will trigger the Speech Permit Policy's "demonstrations and assemblies" requirements.

218. Because Plaintiffs are unsure what type of speech is regulated, they have refrained from engaging in speech on campus and have thus had their protected speech chilled by the University's definition of "demonstrations and assemblies."

219. Key operative terms such as "demonstration," "assembly," "emergent situations," and "special circumstances" in the Speech Permit Policy are unconstitutionally vague facially and as-applied because they are not defined with any precision, such that an ordinary person of reasonable intelligence cannot understand what is prohibited.

220. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Speech Permit Policy, have violated and continue to violate Plaintiffs' Due Process rights, and an injunction against Defendants' Speech Permit Policy and associated practices and actions. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## Count V: The Class System violates Plaintiffs' Due Process rights because it is unconstitutionally vague.

221. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

222. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to due process of law and prohibits Defendants from implementing vague standards that allow for viewpoint discrimination in Defendants' handling of Plaintiffs' speech.

223. The government may not regulate speech through policies that permit arbitrary, discriminatory, or overzealous enforcement.

35

224. The government also may not regulate speech in ways that do not provide persons of common intelligence fair warning as to what speech is permitted and what speech is prohibited.

225. Defendants' Class System Policy contains multiple vague criteria.

226. Defendants have not defined key terms in the student organization regulations with any precision, such that an ordinary person of reasonable intelligence cannot understand what is prohibited.

227. By failing to properly define these key terms, terms such as "entry level," "specific and unique interest," "large and significant interest of the campus community," "general interest," and "large, distinct, and prolific subculture," Defendants are maintaining a set of policies and practices that are unconstitutionally vague, facially and as applied, and therefore violate each of the Plaintiffs' Due Process rights.

228. Defendants enforced their vague Class System Policy against Plaintiffs by classifying YAL as a Class IV organization based upon the viewpoint of their speech which prohibits them from receiving the same benefits as other student organizations.

229. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Class System, have violated and continue to violate Plaintiffs' Due Process rights, and an injunction against Defendants' Class System and associated practices and actions both facially and as-applied. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**Count VI: The Bias Incident Regulations violate Plaintiffs' Due Process rights because they are unconstitutionally vague.**

230. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–161 of this Complaint.

231. Similarly, the University's definition of a "bias incident" is unconstitutionally vague. Plaintiffs seek to engage in protected expression in the open, outdoor areas of campus, but the Regulations do not clearly define which speech is prohibited and Plaintiffs are therefore unsure what types of speech MSU considers a "bias incident" and thus are unsure what types of speech will trigger retribution from the Bias Education Response Team, the Dean of Students, and the University Police.

232. Because Plaintiffs are unsure what type of speech is regulated, they have refrained from engaging in speech on campus and have thus had their protected speech chilled by the University's definition of "bias incident."

233. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants, through the Bias Incident Regulations, have violated and continue to violate Plaintiffs' Due Process rights, and an injunction against Defendants' Bias Incident Regulations and associated practices and actions facially and as-applied. Additionally, Plaintiffs are entitled to compensatory and nominal damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment against Defendants and grant Plaintiffs the following relief:

A. A declaratory judgment that the Speech Permit Policy and associated practices violate Plaintiffs' rights under the First and Fourteenth Amendments both facially and as-applied;

B. A declaratory judgment that Defendants' Class System and associated

practices violate Plaintiffs' rights under the First and Fourteenth Amendments both facially and as-applied;

C. A declaratory judgment that Defendants' Bias Incident Regulations and associated practices violate Plaintiffs' rights under the First and Fourteenth Amendments both facially and as-applied;

D. A preliminary and permanent injunction prohibiting Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Speech Permit Policy, Class System, Bias Incident Regulations, and associated practices challenged in this Complaint;

E. Compensatory and nominal damages for the violation of Plaintiffs' First and Fourteenth Amendment rights from the Defendants sued in their individual capacities;

F. Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

G. All other further relief to which Plaintiffs may be entitled.


Plaintiffs demand a trial by jury in this cause of action.

Respectfully submitted on the 15th day of January, 2020,

s/ Michael Laffey
Michael P. Laffey
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332-9300
mlaffey@messinalawfirm.com

Michael R. Ross*
Tyson C. Langhofer*
ALLIANCE DEFENDING FREEDOM
CENTER FOR ACADEMIC FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(480) 444-0020
mross@ADFlegal.org
tlanghofer@ADFlegal.org

*Counsel for Plaintiffs*

***Pro hac vice applications forthcoming.**

## Declaration under Penalty of Perjury

I, MENA BOTROS, a citizen of the United States and a resident of the State of New Jersey, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _15_ day of January, 2020, at _Jersey City_, New Jersey.

## Certificate of Compliance

I, Michael P. Laffey, certify in accordance with 28 U.S.C. § 1746 and Local Civil Rule 11.2 that the matter in controversy is not the subject of any other action or proceeding before any court, any pending arbitration, or any administrative proceeding.

Dated this 15th day of January, 2020.

s/ Michael P. Laffey
Michael P. Laffey
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332-9300
mlaffey@messinalawfirm.com

*Counsel for Plaintiffs*

40